UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------X

ETAN LEIBOVITZ,

    *Plaintiff*,

  -against-

THE CITY OF NEW YORK, POLICE
OFFICER BRENDAN ANDERSON, POLICE
OFFICER CHRISTOPHER RYAN, POLICE
OFFICER DEL VILLAR,

    *Defendants*.

--------------------------------X

**MEMORANDUM & ORDER**

14-CV-7106(KAM)(LB)

**MATSUMOTO, United States District Judge:**

        In a fourth amended complaint, plaintiff Etan

Leibovitz ("plaintiff"), a self-described "full time activist

and 'citizen journalist,'" proceeding *pro se*, alleges various

violations of his constitutional rights by defendants City of

New York (the "City") and police officers Brendan Anderson

("Officer Anderson"), Christopher Ryan ("Officer Ryan"), and

David Del Villar, sued herein as "Del Villar," ("Officer Del

Villar," together with Officer Anderson and Officer Ryan, the

"officers" or "individual defendants," and the individual

defendants together with the City, "defendants") in connection

with his arrest on November 19, 2014 and subsequent criminal

proceedings. (*See* Fourth Amended Verified Complaint ("Compl."

or the "complaint"), ECF No. 62, at ¶¶ 1-6, 18.) Defendants

have moved to dismiss the complaint for failure to state a claim

pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6).

(Defendants' Memorandum of Law ("Def. Mem."), ECF No. 84, at 1.)[1]

For the reasons set forth below, defendants' motion to dismiss

for failure to state a claim is granted in its entirety.

## Background

I.   **Factual Background**

   A.   **Plaintiff's Arrest**

   As alleged in the complaint, at approximately 4:45

p.m. on November 19, 2014, plaintiff was arrested near the

intersection of 84th Drive and Queens Boulevard in Queens, New

York. (*See* Compl. at ¶¶ 25-76, 103.)  On that date, plaintiff

had been walking when he came upon Officers Anderson, Ryan, and

Del Villar[2] searching a car and detaining an unidentified man, at

approximately 4:30 p.m.  (*Id.* at ¶¶ 26-27.)  The car was the

"first car on the street," *i.e.*, closest to the intersection,

and was parked on 84th Drive facing Queens Boulevard.  (*Id.* at ¶

27.)  The detainee was "positioned with his back towards [the

car], by the trunk, [and] standing," with Officer Anderson

facing him.  (*Id.*)  Officer Ryan was searching the back seat of

the car, Officer Del Villar was searching the front passenger

area, and both officers were "positioned sideways, parallel to

---

[1]   Defendants' Notice of Motion, (ECF No. 81), states that defendants will
move pursuant to Rule 12(c), which governs motions for judgment on the
pleadings, but the briefing focuses on Rule 12(b)(6).
[2]   The complaint does not indicate whether other officers were at the
scene at the time plaintiff arrived.

the ground." (*Id.*)  From approximately ten to twelve feet away from the hood of the vehicle being searched, plaintiff also observed that a crowd of twenty-five to thirty bystanders had gathered on the southeast and southwest corners of the intersection of 84th Drive and Queens Boulevard.  (*Id.*)

After plaintiff had observed the scene "for a few minutes," Officer Del Villar asked plaintiff, "[c]an I help you?"  (*Id.* at ¶¶ 27-28.)  Plaintiff responded by stating "[n]o, I am just observing."  (*Id.* at ¶ 29.)  The officers did not, at that time, direct plaintiff to move.  (*Id.* at ¶ 30.)  At this point, plaintiff began recording on his cellular phone the officers' search of the vehicle.  (*Id.* at ¶ 31.)  Several minutes later, Officer Anderson asked plaintiff what plaintiff was doing, and plaintiff stated that he was recording the search.  (*Id.* at ¶¶ 35-36.)  Officer Anderson then directed plaintiff to "move back," (*id.* at ¶ 37), and plaintiff asked the officers where they would like him to stand.  (*Id.* at ¶ 38.)  Officer Anderson ordered plaintiff to move "approximately 3 [to] 5 feet in the direction of Main Street,"[3] (*id.* at ¶ 40), and plaintiff complied.  (*Id.* at ¶ 39.)

---

[3]     The plaintiff does not comprehensively describe the layout of the area where the November 19, 2014 arrest took place.  However, in adjudicating a motion to dismiss, "[t]he court may consider matters of which judicial notice may be taken," including maps.  *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 691-92 (S.D.N.Y. 2011) (citations and quotations omitted); *see also Halebian v. Berv*, 644 F.3d 122, 130 n.7 (2d Cir. 2011) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)) (noting that courts may properly consider "matters of which judicial notice

According to plaintiff's complaint, after initially complying with Officer Anderson's direction to move back toward Main Street, plaintiff found it "more difficult to observe and record" the officers, (*id.* at ¶¶ 39-40), and, after a few minutes, plaintiff desired to document "that the detainee had his back to [the car] as well as the crowd that was gathering." (*Id.* at ¶ 42.) Plaintiff then moved back toward the search on 84th Drive; specifically, he alleges that, "[w]hile still videotaping, [he] walked straight ahead on the side walk [sic], approximately 20 feet, parallel to 84th [Drive]," then "made a U-turn and headed back." (*Id.* at ¶¶ 43-44.) As plaintiff was returning to the area from which he had previously been filming,

---

may be taken" in adjudicating a motion to dismiss); Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.") The court therefore takes judicial notice of the below diagram of the relevant intersection, produced by New York City and with the orientation and scale of the diagram indicated in its lower right-hand corner:



New York City, *NYCity Map*, *available at* http://maps.nyc.gov/doitt/nycitymap/ (last accessed Feb. 28, 2018).

Officer Del Villar stated to plaintiff, "[h]ey sir!" (*Id.* at ¶ 45.) Plaintiff replied, "I am just taping it. Cameras make officers accountable." (*Id.* at ¶ 45.) Officer Anderson responded to plaintiff by saying "[y]ou are going to make it to Hollywood," and threw an unidentified object "at [plaintiff]." (*Id.* at ¶ 46.)

Plaintiff then asked Officer Anderson if he had thrown an object at plaintiff, and an unidentified bystander said, to one or more of the officers, "[h]ey, that's not nice[.]" (*Id.* at ¶¶ 47-48.) Plaintiff then said, to the bystander, "I know, did you see that?" (*Id.* at ¶ 49.) The bystander responded, "I saw it. . . . I am on your side honey." (*Id.* at ¶ 50.) Plaintiff responded by stating, "[t]hey are retaliating, should we have them arrested? These pigs . . . [t]hey think they run the streets here. They work for us." (*Id.* at ¶¶ 51-52.)

At this point, Officer Del Villar approached plaintiff and said, in relevant part, "you can film all you want . . . [b]ut you will not use bad language in front of me!" (*Id.* at ¶¶ 53-57.) Officer Anderson then asked plaintiff why he was recording, and plaintiff replied that he was exercising his First Amendment right to record the officers conducting what Mr. Leibovitz believed to be an unlawful search. (*Id.* at ¶¶ 58-59.) Officer Anderson responded by referring to plaintiff as "'a punk,' or words to that effect," and plaintiff responded,

"[w]hat? . . . I know my rights, according to *Glik v. Cunniffe*."
(*Id.* at ¶¶ 60-61.)  Officer Anderson then ordered plaintiff to
leave the scene.  (*Id.* at ¶¶ 62-63.)  Plaintiff "chose to
continue recording," (*id.* at ¶ 65), and stated that he had
"every right to record."  (*Id.* at ¶ 66.)  At this point, the
officers handcuffed and arrested plaintiff (*See id.* at ¶¶ 67-
76.)  During that time, Officer Anderson stated "[o]h no, I have
a cut now, we have you for assault."  (*Id.* at ¶ 71.)
Additionally, according to plaintiff's complaint, "[a]t no point
did the [officers] state for [plaintiff] to put his hands behind
his back," (*id.* at ¶ 68), and plaintiff "did not resist arrest
nor did **he assault anyone**."  (*Id.* at ¶ 73 (emphasis in
original).)  Plaintiff was arrested at approximately 4:45 p.m.
(*Id.* at ¶ 76.)

    After the officers arrested plaintiff, they placed him
in the back of a police car.  (*Id.* at ¶ 75.)  While plaintiff
was in the car, an unidentified New York Police Department
supervisor arrived at the scene and spoke with the officers.
(*Id.* at ¶ 84-86.)  The supervisor then, in relevant part, told
plaintiff that he was being arrested for "disorderly conduct,
resisting arrest, and OGA," or obstruction of governmental
administration.  (*Id.* at ¶ 89.)  Approximately thirty to forty
witnesses observed the incident and arrest.  (*Id.* at ¶ 93.)  The

officers then transported plaintiff to the 107th Precinct, where his arrest was processed.  (*Id.* at ¶¶ 92-96.)

Following plaintiff's arrest, Officer Ryan initiated a criminal proceeding by executing under oath a criminal complaint, which he caused to be filed.  (*Id.* at ¶¶ 98-99.)  The criminal complaint, in relevant part, asserted that Officer Anderson had asked plaintiff to step back multiple times, that plaintiff had refused and began to yell and curse, causing a crowd to gather, and that plaintiff refused to provide identification when asked.  (*Id.* at ¶ 99.)  The criminal complaint further asserted that when Officer Anderson was attempting to handcuff plaintiff, plaintiff flailed his arms, grabbed Officer Anderson's hand, and lunged forward into a metal gate causing Officer Anderson to sustain lacerations and substantial pain to his hand, which required medical treatment at a local hospital.  (*Id.*)  Plaintiff asserts that the officers lied to the Queens District Attorney's Office and that the criminal complaint was "falsified," but does not elaborate as to any allegedly false allegations in the criminal complaint.  (*Id.* at ¶¶ 97, 101.)

### B.  Criminal Proceedings Against Plaintiff

Based on the criminal complaint, executed by Officer Ryan, the Queens County District Attorney's Office charged plaintiff with one count of assault in the second degree, one

count of obstructing governmental administration in the second degree, and one count of resisting arrest. (*Id.* at ¶ 103.) Plaintiff was arraigned and released on his own recognizance on November 20, 2014. (*Id.* at ¶¶ 104-05.) Plaintiff appeared in Queens County Criminal Court on December 11, 2014, at which time the Queens County District Attorney's Office offered to reduce the assault charge from a second degree charge to a third degree charge and offered plaintiff an adjournment in contemplation of dismissal, which he declined. (*Id.* at ¶ 122.)

Plaintiff subsequently made several appearances in Queens County Criminal Court and made various demands for discovery. (*See, e.g., id.* at ¶¶ 129, 163, 168 (noting appearances in January, March, and April 2015 and demands made at each appearance); *see also id.* at ¶ 177 (discussing other appearances).) On October 30, 2015, the criminal case was "disposed of favorably" with respect to plaintiff. (*Id.* at ¶ 182.)

## C. Plaintiff's CCRB and Internal Affairs Complaints

On November 26, 2014, plaintiff filed a complaint (the "CCRB Complaint") with the New York City Civilian Complaint Review Board ("CCRB"). (*Id.* at ¶ 106.) On November 28, 2014, plaintiff filed a separate complaint (the "IAB Complaint") with the New York Police Department's Internal Affairs Bureau

("IAB").[4]  (*Id.* at ¶¶ 107.)  More specifically, plaintiff spoke

with Oleg Chemyavsky of the "Legal Department at One Police

Plaza," who opened the IAB Complaint, and the IAB Complaint was

assigned complaint number 2014-39042.  (*Id.* at ¶¶ 107-09.)  The

investigation of the IAB Complaint was subsequently referred to

the New York Police Department's Queens South office, (*id.* at ¶

110-11), which in turn informed plaintiff on January 7, 2015

that "Sergeant Busby" of the 107th Precinct had been assigned to

investigate plaintiff's IAB Complaint.[5]  (*Id.* at ¶ 125.)

Plaintiff "expressed his concern" that it might be improper for

the New York Police Department to investigate allegations of

misconduct by its own officers and was told that such

investigation is "standard NYPD policy."  (*Id.* at ¶¶ 126-27.)

Plaintiff then began trying to contact Sergeant Busby.  (*Id.* at

¶ 128.)

Plaintiff's efforts to reach Sergeant Busby were

unsuccessful, (*id.* at ¶ 131), but on March 13, 2015, plaintiff

spoke with "Lieutenant Almonte" of the 107th Precinct regarding

his IAB Complaint.  (*Id* at ¶¶ 131-34.)  Lieutenant Almonte

informed plaintiff that he would be investigating plaintiff's

---

[4]     Plaintiff states that the IAB Complaint was against the officers, but
does the complaint does not expressly indicate against whom the CCRB
Complaint was filed, or what specific issues he raised in either of the
complaints.  (*See* Compl. at ¶ 106-07.)
[5]     Specifically, the complaint states that "Sergeant Busby . . . would be
investigating his complaint 2014-39042."  (Compl. at ¶ 125.)  It is not clear
whether Sergeant Busby was also responsible for investigating the CCRB
Complaint.

IAB Complaint,[6] and plaintiff reiterated his concerns about the New York Police Department's policies regarding investigations of allegations of officer misconduct. (*Id.* at 135-37.) Lieutenant Almonte stated that the department's policies were "established" and asked plaintiff what happened on the date of plaintiff's arrest. (*Id.* at ¶¶ 138-39.) Plaintiff suggested that he could provide Lieutenant Almonte with a copy of plaintiff's "Verified Amended Complaint" in the instant action, Lieutenant Almonte declined, and plaintiff subsequently ended the call because plaintiff's "recording device battery died." (*Id.* at ¶¶ 140-43.)

Plaintiff spoke to Lieutenant Almonte again on March 19, 2015. (*Id.* at ¶¶ 146-47.) At that time, and in relevant part, Lieutenant Almonte advised plaintiff that he had concluded his investigation, "as a result of [plaintiff] stating that he didn't want the NYPD to investigate." (*Id.* at ¶ 148.) For his part, plaintiff questioned the thoroughness of the investigation in light of Lieutenant Almonte's admission that he had not reviewed "the criminal complaint relating to [plaintiff's] November 19th, 2014 arrest," suggested the investigation should be reopened, and expressed his view that Lieutenant Almonte

---

[6] While the complaint specifically states that Lieutenant Almonte informed plaintiff that "he w[ould] be conducting the investigation with regards to complaint 2014-39042," *i.e.*, the IAB Complaint, it is not clear whether Lieutenant Almonte had any involvement in the investigation of the CCRB Complaint.

might have a conflict of interest because the defendant officers "were from his precinct." (*See id.* at ¶¶ 152-160.) As of March 19, 2015, the investigation regarding plaintiff's IAB Complaint concluded with a finding that the defendant officers' actions were justified. (*Id.* at ¶¶ 161-62.)

On April 30, 2015, plaintiff filed a new complaint with IAB. (*Id.* at ¶ 170.) Plaintiff's new complaint complained of the poor handling of his prior IAB Complaint, questioned the New York Police Department's practice of investigating allegations of misconduct against its own officers, and expressed concerns regarding certain aspects of his arrest and the criminal complaint against him. (*Id.* at ¶ 172.) On May 18, 2015, plaintiff was informed that "Sergeant Smith" was assigned to investigate the new IAB complaint, and that same day, plaintiff placed a phone call to Sergeant Smith and communicated his concerns. (*Id.* at ¶¶ 173-74.) Over the following months, plaintiff called Sergeant Smith several times to inquire as to the status of Sergeant Smith's investigation, (*id.* at ¶¶ 175), and on November 12, 2015, Sergeant Smith informed plaintiff that he had concluded his investigation and found no malfeasance by Lieutenant Almonte or the defendant officers. (*Id.* at 183-86.)

## II. Procedural Background

Plaintiff commenced the instant action on December 1, 2014, by filing a "verified complaint," ("Initial Complaint,"

ECF No. 1), against the City, Officer Anderson,[7] and two

fictitious defendants.  On December 9, 2014, Magistrate Judge

Lois Bloom granted plaintiff's motion to proceed *in forma*

*pauperis* under 28 U.S.C. § 1915, (Order Granting *In Forma*

*Pauperis* Application, ECF No. 4), and on December 15, 2014,

plaintiff filed his first amended complaint ("FAC," ECF No. 6),

that, in relevant part, replaced the two fictitious defendants

with Officers Del Villar and Ryan.  The Initial Complaint and

FAC both alleged that the defendants had violated plaintiff's

rights under the United States and New York State Constitutions

by preventing him from recording his interactions with public

officials.  (Initial Complaint at ¶¶ 82-89; FAC at ¶¶ 80-87.)

On April 22, 2015, the court held a pre-motion conference at

which the court granted plaintiff leave to file a second amended

complaint ("SAC") and granted defendants leave to file a motion

to dismiss plaintiff's SAC.  (*See* April 22, 2015 Minute Entry.)

On May 20, 2015, plaintiff filed his SAC, (ECF No.

31), which, among other things, added claims for false arrest,

false imprisonment, and malicious abuse of process under federal

and New York law, as well as for assault and battery under New

York law.  (SAC at ¶¶ 172-77, 183-202.)  Because, at that time,

plaintiff's criminal case remained pending and defendant

---

[7]     The Initial Complaint referred to Officer Anderson as "Detective
Brendan Anderson."  (Initial Complaint at ¶ 16.)

indicated that he would not waive his Fifth Amendment rights with respect to the instant action, defendants sought, plaintiff consented to, and Magistrate Judge Bloom granted, a stay of this action. (*See* Letter Motion for Stay, ECF No. 33; Order Granting Stay, ECF No. 34.)

In a letter dated November 4, 2015, plaintiff notified the court that the Queens County District Attorney's Office dismissed the criminal case against him on October 30, 2015, and indicated that he would seek to file a third amended complaint. (*See* November 4, 2015 Letter, ECF No. 35.) Plaintiff provided defendants with a copy of his proposed third amended complaint ("TAC," ECF No. 43), and filed it with the court on January 27, 2016. On February 4, 2016, defendants consented to plaintiff's amendment. (February 4, 2016 Letter, ECF No. 46.) On April 6, 2016, defendants sought leave to move to dismiss the TAC, (*see* Letter Seeking Pre-Motion Conference, ECF No. 52), and at a pre-motion conference held on May 6, 2016, the court granted plaintiff leave to file a fourth amended complaint and instructed the parties to inform the court how they intended to proceed following plaintiff's amendment. (*See* May 6, 2016 Minute Entry.)

Plaintiff filed his Fourth Amended Complaint, which is presently before the court, asserting fourteen causes of action

under federal and New York law, on May 20, 2016.[8]  Plaintiff's

first and second causes of action are against the City and are

brought pursuant to 42 U.S.C. § 1983 ("section 1983") and *Monell*

*v. Department of Social Services*, 436 U.S. 658 (1978), and

allege, respectively, deprivation of plaintiff's First Amendment

right to videotape police officers, (Compl. at ¶¶ 202-18), and

plaintiff's Fourteenth Amendment rights by virtue of the New

York Police Department's practice of itself conducting

investigations of misconduct by its own employees.  (*Id.* at ¶¶

219-25.)  Plaintiff's third through sixth causes of action are

brought under section 1983 against Officers Anderson, Ryan, and

Del Villar and allege deprivation of plaintiff's First Amendment

right to videotape police officers, (*id.* at ¶¶ 226-30), false

arrest and false imprisonment in connection with Plaintiff's

November 19, 2014 arrest and subsequent detention, (*id.* at ¶¶

231-36), "denial of due process" under the Fourth and Fourteenth

Amendments, and malicious prosecution (*id.* at ¶¶ 237-47), and

malicious abuse of process.  (*Id.* at ¶¶ 248-54.)  Plaintiff's

malicious prosecution and malicious abuse of process claims

arise out of the officers' roles in arresting plaintiff as well

as in initiating and maintaining his criminal prosecution.  (*Id.*

at 237-54.)

---

[8]     Plaintiff also filed a document styled as an "Addendum" to the
complaint on February 15, 2017, (ECF No. 74), but this document does not
relate to the substance of his allegations.

Plaintiff's remaining causes of action are brought under state law and arise out of plaintiff's November 19, 2014 arrest and subsequent proceedings. (*See generally id.* at ¶¶ 255-99). More specifically, plaintiff asserts, against the City, a claim for negligent hiring and/or failure to supervise, (*id.* at ¶¶ 259-260), and against the individual defendants, claims for violation of his rights under the New York State Constitution, false arrest and false imprisonment, malicious prosecution, malicious abuse of process, "the torts of assault and battery," and intentional infliction of emotional distress against Officers Anderson, Ryan, and Del Villar. (*See id.* at ¶¶ 261-99.) Plaintiff also seeks to hold the City liable for the individual officers' alleged tortious conduct under the doctrine of *respondeat superior*.[9] (*Id.* at ¶¶ 255-58.)

Defendants now move to dismiss the fourth amended complaint, (*see generally* Def. Mem.), and plaintiff opposes their motion. (*See generally* Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss ("plaintiff's opposition," or "Opp."), ECF No. 86.)[10]

---

[9]   More specifically, the complaint purports to assert a separate "cause of action" for "*respondeat superior* liability" against the City, (Compl. at ¶¶ 255-258), based on the individual officers' alleged state law torts. This "cause of action" is, as discussed below, more accurately characterized as a theory of liability under which the city could be held liable for the state law torts of the individual defendants. (*See* Discussion § II.H, *infra* at 70-72.)

[10]   Because plaintiff's opposition consists of several documents, citations to pages in plaintiff's opposition are to the pagination generated by the ECF system, and not to the pagination provided in plaintiff's submissions.

<u>**Legal Standard**</u>

**I.    Rule 12(b)(6)**

    **A.    Standard**

"To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  A claim is plausible on its face when it contains sufficient factual content to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556). Although "[t]he plausibility standard is not akin to a 'probability requirement,'" pleading "facts that are 'merely consistent with' a defendant's liability" does not suffice to establish plausibility.  *Id.* (citing and quoting *Twombly*, 550 U.S. at 556-57).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" nor will a complaint that merely "tenders 'naked assertions' devoid of 'further factual enhancement.'"  *Id.* (citing and quoting *Twombly*, 550 U.S. at 555-57).  Importantly, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," *id.*, as well as to any

"legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (citations omitted).

Where a plaintiff proceeds *pro se*, courts must construe the plaintiff's complaint "liberally" at the motion to dismiss stage. *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). This means that the court must interpret a *pro se* complaint "to raise the strongest arguments that [it] suggest[s]." *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). Nonetheless, to survive a motion to dismiss, a *pro se* complaint "must contain sufficient factual allegations to meet the plausibility standard." *Green v. McLaughlin*, 480 F. App'x 44, 46 (2d Cir. 2012) (summary order) (citing *Harris*, 572 F.3d at 72).

### B. Matters Outside the Pleadings

As discussed above, a motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint. Therefore, "the district court is normally required to look only to the allegations on the face of the complaint." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). "Documents that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered," and "a document upon which the complaint solely relies and which is integral to the complaint may [also] be considered." *Id.* (internal quotations, citations, and emphasis omitted).

Here, in opposition to defendants' motion to dismiss, plaintiff has submitted various documents that are outside the scope of the Rule 12(b)(6) inquiry, including an affidavit, a statement of material facts pursuant to Local Rule 56.1, and a compact disc containing photographs, documents, and a video. (*See, e.g.*, Plaintiff's Affidavit, ECF No. 85; Opp. at 6-9 (attaching statement of facts), 27-30 (attaching photographs and image of compact disc).) None of these documents were attached to, or incorporated by reference in, any of plaintiff's complaints, nor do they appear to be documents upon which the complaint relies such that they are integral to it. The court, therefore, will not consider those documents in deciding the defendants' motion.[11]

## II. Qualified Immunity

In addition to asserting that plaintiff fails to state a claim under Rule 12(b)(6), Defendants argue that the individual defendants are entitled to qualified immunity. (*See* Def. Mem. at 11-16.)

"Qualified immunity protects public officials from liability for civil damages when one of two conditions is

---

[11]    The court has viewed the video of the incident described in plaintiff's complaint, and notes that it appears from the video that plaintiff was closer to the officers and the car being searched than alleged in the complaint. Nevertheless, the court will not consider the video for purposes of adjudicating the instant motion and will accept as true all of the complaint's well-pleaded, nonconclusory factual allegations.

satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007)). Regarding the first of these conditions, "[o]nly Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." *Moore v. Vega*, 371 F.3d 110, 114 (2d Cir. 2004) (citing *Townes v. City of New York*, 176 F.3d 138, 144 (2d Cir. 1999)).

As to the second condition, "the relevant question is whether a reasonable officer could have believed the [challenged conduct] to be lawful, in light of clearly established law and the information the . . . officer[] possessed." *Id.* at 115 (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). As this formulation implies, the court may not evaluate the officer's conduct "with 20/20 hindsight." *Salim v. Proulx*, 93 F.3d 86, 91 (2d Cir. 1996). Instead, "[t]he doctrine of qualified immunity serves to protect police from liability and suit when they are required to make on-the-spot judgments in tense circumstances," *Lennon v. Miller*, 66 F.3d 416, 424 (2d Cir. 1995) (citations omitted), and the court must therefore evaluate challenged conduct "from the perspective of a

reasonable officer on the scene." *Kerman v. City of New York*, 261 F.3d 229, 239 (2d Cir. 2001) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Importantly, a defendant public official will be entitled to qualified immunity even if his decision was mistaken, so long as the decision was reasonable. *Castro v. United States*, 34 F.3d 106, 112 (2d Cir. 1994) (quoting *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). Further, "[t]he protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks and citation omitted). In sum, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter*, 502 U.S. at 229 (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)).

Finally, because qualified immunity grants immunity from suit as well as from liability, courts should address it at the "earliest possible stage in litigation," *Pearson*, 555 U.S. at 231-32, and courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236.

**Discussion**

**I.   Section 1983 Claims**

Section 1983 imposes liability on any "person" who deprives another of the rights, privileges, or immunities secured by the Constitution or laws of the United States and does so under color of law.  *See* 42 U.S.C. § 1983.  A section 1983 claim therefore has two essential elements.  First, the "the conduct complained of must have been committed by a person acting under color of state law."  *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994) (citation omitted).  Second, the conduct must have deprived the plaintiff of "rights, privileges or immunities secured by the Constitution or laws of the United States."  *Id.*

**A.   Section 1983 Claims Against Individual Defendants**

**i.   First Amendment Claim**

The complaint asserts that Officers Anderson, Ryan, and Del Villar violated plaintiff's First Amendment rights in connection with the events of November 19, 2014, including by making "intimidating demands and unlawful direct orders . . . that plaintiff [cannot] record interactions between public officials in a public place."  (Compl. at ¶ 228.)  "To recover on a First Amendment claim under [section] 1983, a plaintiff must demonstrate that his conduct is deserving of First Amendment protection and that the defendants' conduct of

21

harassment was motivated by or substantially caused by his exercise of free speech." *Rattner v. Netburn*, 930 F.2d 204, 208 (2d Cir. 1991) (quoting *Donahue v. Windsor Locks Board of Fire Commissioners*, 834 F.2d 54, 58 (2d Cir. 1987)); *see also Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) ("To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." (citation omitted)).[12]

Here, plaintiff fails adequately to allege that the conduct prompting his arrest was protected by the First Amendment because, even assuming that he has a "clearly established" right to observe and videotape police activity, any orders by the police that resulted in restrictions on that right were reasonable and permissible under the circumstances alleged.[13] In the alternative, plaintiff fails adequately to

---

[12] To the extent plaintiff asserts First Amendment retaliatory arrest, imprisonment, and/or prosecution claims, the court considers those claims as part of its analysis of plaintiff's false arrest, false imprisonment, and malicious prosecution claims because the individual defendants' alleged retaliatory conduct consists of arresting plaintiff, detaining him following his arrest, and initiating his prosecution.

[13] It is not clear that the right to record police was "clearly established" as of November 19, 2014. *Higginbotham v. City of New York*, 105 F. Supp. 3d 369 (S.D.N.Y. 2015), which plaintiff cites in support of his contention that the right to film police is "clearly established," and appears to be the only case in which a district court in this circuit has reached that conclusion, was decided on May 15, 2015, almost six months *after* plaintiff's arrest. Further, *Higginbotham* is not controlling because the relevant decision issued from one of the court's sister districts, not the Second Circuit, and in the time since *Higginbotham*, the Second Circuit has

22

allege that the defendant officers are not entitled to qualified immunity because even assuming that the right to videotape police is "clearly established" and that defendant officers' conduct violated this right, it was objectively reasonable for the officers to believe that their actions did not violate clearly established law.

The complaint alleges that when plaintiff informed Officer Anderson that plaintiff was recording the search, Officer Anderson directed him to move approximately three to five feet in the direction of Main Street, *i.e.*, away from the car that the defendant officers were searching. (Compl. at ¶¶ 35-40.) Plaintiff alleges that he initially complied, (*id.* at ¶ 39), but then moved back toward the search on 84th Drive, because he wanted to record the incident and the gathering crowd. (*Id.* at ¶¶ 42-43.) The complaint also alleges that, after plaintiff had turned back toward the area to which Officer

_____

affirmed a finding that the right to film police is *not* clearly established. *See Basinski v. City of New York*, 192 F. Supp. 3d 360, 367-68 (S.D.N.Y. 2016) ("The Court finds that [Officer] Browne and [Lieutenant] Cocchi are entitled to qualified immunity on Basinski's First Amendment claims because the right to record police activity is not one that was 'clearly established.'"), *aff'd,* 706 F. App'x 693 (2d Cir. 2017). As explained in this order, the court concludes that the restriction allegedly imposed on plaintiff's ability to videotape police was justified, and his conduct in disobeying police orders and distracting the officers from the performance of their official duties was not protected by the First Amendment. Further, to the extent the court finds qualified immunity as an alternative holding, the court does so on the basis of the second qualified immunity condition, *i.e.* because it was objectively reasonable for the individual defendants to believe their conduct did not violate a clearly established right. Therefore, the court need not conclusively determine whether the right to film police was "clearly established" at the time of plaintiff's arrest.

Anderson had directed him, he exchanged words with the officers, (*id.* at ¶ 44-45), including asking another bystander if plaintiff and the bystander should "have them arrested" and calling them "pigs." (*Id.* at ¶ 51.) Officer Del Villar then left the ongoing search, walked over, and told plaintiff, in relevant part, "you can film all you want . . . [b]ut you will not use bad language in front of me!" (*Id.* at ¶¶ 53-57.)

The court notes that the allegations in the complaint, accepted as true, therefore contradict plaintiff's stated basis for his First Amendment claim, which is that the defendant officers told plaintiff that he was categorically barred from "recording public officials in a public place." (*Id.* at ¶ 228.) Instead, plaintiff's allegations establish that the defendant officers allowed plaintiff to record the search of the vehicle, though from a location that plaintiff alleges did not provide the best viewpoint. The complaint also alleges that Officer Del Villar affirmatively advised plaintiff, "you can film all you want." (*Id.* at ¶ 55.) The court notes that the complaint does not allege any personal involvement of Officer Ryan vis-à-vis plaintiff until after plaintiff was placed under arrest, and thus does not allege a section 1983 First Amendment claim against Officer Ryan.

Nevertheless, because plaintiff is proceeding *pro se*, the court reads the complaint to raise the strongest possible

argument that it suggests.  Read liberally, the complaint suggests that Officer Anderson's initial instruction to move back three to five feet in the direction of Main Street, (Compl. at ¶ 40), and his ultimate order to leave the scene, (*id.* at ¶ 63), were motivated or substantially caused by plaintiff's exercise of his First Amendment rights.

Plaintiff asserts that there is a First Amendment right to videotape police officers in the performance of their official duties.  As noted, the Second Circuit and the Supreme Court have not expressly recognized such a right.  Even the courts that have recognized this right have made clear that the right to videotape is "not without limitations" and "may be subject to reasonable time, place, and manner restrictions." *Glik v. Cunniffe*, 655 F.3d 78, 84 (1st Cir. 2011) (citing *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) ("[W]e agree with the Smiths that they had a First Amendment right, subject to reasonable time, manner and place restrictions, to photograph or videotape police conduct.")); *see also Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 379 (S.D.N.Y. 2015) ("All of the circuit courts that have [addressed the issue] . . . have concluded that the First Amendment protects the right to record police officers performing their duties in a public space, subject to reasonable time, place and manner restrictions." (citations omitted)).  Time, place, and

manner restrictions, in turn, are permissible if they "(1) are justified without reference to the content of the regulated speech, (2) are narrowly tailored to serve a significant governmental interest, and (3) leave open ample alternative channels for communication of the information." *Akinnagbe v. City of New York*, 128 F. Supp. 3d 539, 548 (E.D.N.Y. 2015) (quoting *Marcavage v. City of New York*, 689 F.3d 98, 104 (2d Cir. 2012)).

Furthermore, "the right [to record police officers in public] does not apply when the recording would impede police officers in the performance of their duties." *Higginbotham*, 105 F. Supp. 3d at 379-80; *see also Basinksi*, 192 F. Supp. 3d at 368 ("[C]ourts within this Circuit have recognized that 'in cases where the right to record police activity has been recognized by our sister circuits, it appears that the protected conduct has typically involved using a handheld device to photograph or videotape at a certain distance from, and without interfering with, the police activity at issue.'" (quoting *Rivera v. Foley*, No. 14-CV-196(VLB), 2015 WL 1296258, at *10 (D. Conn. Mar. 23, 2015))).

The allegations in the complaint, accepted as true, establish that when plaintiff first came upon the defendant officers, a crowd of twenty-five to thirty onlookers had formed and the officers were performing their official duties,

specifically by searching a car and detaining a person. (Compl. at ¶ 27.) The complaint further alleges that plaintiff was initially standing ten to twelve feet away from the vehicle search, (*id.*), that Officer Anderson instructed plaintiff to step back three to five feet, (*id.* at ¶¶ 37-40), and that a crowd continued to gather. (*Id.* at ¶ 42.)

Even viewing these allegations in the light most favorable to plaintiff, Officer Anderson's initial instruction to step back constitutes a justified and narrow restriction on the manner in which plaintiff could exercise his asserted First Amendment right to film the defendant officers' search. The police request to step back three to five feet is *de minimis* and the allegations in the complaint, if true, would not establish that the police directive to retreat three to five feet was so unreasonable that plaintiff was deprived of his purported First Amendment right to film the police.[14]

Further, the government has a compelling interest in maintaining order while a crowd continues to gather at the scene of police activities. *Cf. Basinski v. City of New York*, 706 F.

---

[14] Plaintiff asserts, in a vague and conclusory manner, that, due to the presence of a telephone booth, he found it "more difficult to observe and record" the defendant officers from his new vantage point. (Compl. at ¶¶ 40-41.) The following paragraphs, however, indicate that plaintiff moved because he wanted to document the size of the crowd that was gathering and the detainee's orientation relative to the car. (*Id.* at ¶¶ 42-43.) Plaintiff does not allege that he could not have documented the gathering crowd size and the detainee's location while complying with the police order by keeping a distance from the ongoing search.

App'x 693, 697-98 (summary order) (discussing cases interpreting New York obstruction of governmental administration statute); *cf. also Bruno v. City of Schenectady*, No. 12-CV-285(GTS)(RFT), 2016 WL 1057041, at *12 (N.D.N.Y. Mar. 14, 2016) (finding probable cause to arrest where "Plaintiff's repeated and deliberate disregard of Defendant['s] . . . order to stay behind the police tape, which was exacerbated by her disruptive harangue, interfered with [Defendant's] performance of his [official] dut[ies]."). Based on the allegations in the complaint, Officer Anderson's instruction to step back was justified and narrowly tailored to serve a compelling government interest in maintaining order in a gathering crowd while conducting police activity, and did not preclude plaintiff from continuing to film the scene.

Additionally, under the first prong of the reasonableness test, Officer Anderson's instruction was "justified without reference to the content of the regulated speech," *see Marcavage*, 689 F.3d at 104, based on the significant body of authority indicating that officers may direct or restrict the movements of individuals at or around the scene of police activity. *See, e.g., Basinski*, 706 F. App'x at 697-98 (discussing cases interpreting New York obstruction of governmental administration statute); *Matter of Davan L.*, 689 N.E.2d 909, 910-11 (N.Y. 1997) (affirming finding that

juvenile's conduct, if committed by an adult, would constitute obstruction of governmental administration where juvenile had been directed to stay clear of "confined and defined" police activity area, but entered area and yelled that police were "coming"); *cf. also Salmon v. Blesser*, 802 F.3d 249, 253 (2d Cir. 2015) ("Police officers frequently order persons to leave public areas: crime scenes, accident sites, dangerous construction venues, anticipated flood or fire paths, parade routes, areas of public disorder, etc. . . . Our precedent does not view such police conduct, without more, as a seizure under the Fourth Amendment as long as the person is otherwise free to go where he wishes.").

The complaint's allegations, assumed for purposes of this motion to be true, establish that although plaintiff initially complied with Officer Anderson's instruction, plaintiff then "walked straight ahead on the side walk, approximately 20 feet, parallel to 84th [Drive]," thereby moving away from Queens Boulevard and closer to the location where the officers were searching the car and detaining an individual, because he wanted a better vantage point to document the police activity and the "the crowd that was gathering." (Compl. at ¶¶ 39, 42-44.) Plaintiff's return to the area of the search caused Officer Del Villar to turn his attention away from his police activities, and to state to plaintiff, "[h]ey, sir!" (Compl. at

¶¶ 42-45.)  After Officer Del Villar's attention was diverted from his duties and focused on plaintiff, plaintiff asked a bystander whether they should have the defendant officers arrested, referred to the officers as "pigs," and said, "[t]hey think they run the streets here.  They work for us."  (*Id.* at ¶¶ 51-52.)  Officer Del Villar physically left the search, walked toward plaintiff, and said, "you can film all you want," but directed that plaintiff not "use bad language."  (*Id.* at ¶ 53-57.)

Thus, plaintiff's conduct had demonstrated clear defiance of a lawful police directive and interference with police activities.  Thereafter, Officer Anderson ordered plaintiff to leave the scene, but plaintiff allegedly chose again to defy a lawful police order and to accept the risk of doing so.  (*Id.* at ¶¶ 63-65.)  The foregoing conduct, alleged in the complaint, is not protected by the First Amendment.  *See, e.g., Davan L.*, 689 N.E.2d at 910-11 (affirming finding that juvenile's conduct, if committed by an adult, would constitute obstruction of governmental administration where juvenile had been directed to stay clear of "confined and defined" police activity area, but entered area and yelled that police were "coming"); *see also People v. Case*, 365 N.E.2d 872, 874-75 (N.Y. 1977) (noting that "mere words alone" cannot support charge of obstructing governmental administration, but words combined with

interference that is "in part at least, physical in nature" will support such a charge); *Higginbotham*, 105 F. Supp. 3d at 379-80 ("[T]he right [to record police officers in public] does not apply when the recording would impede police officers in the performance of their duties."); *Salmon*, 802 F.3d at 253 (noting that police officers frequently order persons to leave public areas in the course of performing their official duties).

Once plaintiff defied the officers' request to retreat three to five feet, moved closer to the scene, continued to disrupt the performance of the officers' duties, and refused to obey Officer Anderson's order to leave, it was proper to arrest plaintiff. *See Davan L.*, 689 N.E.2d at 910-11; *see also Kass v. City of New York*, 864 F.3d 200, 209 (2d Cir. 2017) ("Although the interference [with a public official's performance of duties] must at least in part be 'physical' and cannot consist solely of verbal statements, an officer may consider both words and deeds in determining whether the individual's conduct is sufficiently obstructive to justify an arrest." (citations omitted)), *cert. denied sub nom. Kass v. City of New York, N.Y.*, 138 S. Ct. 487 (2017); *Bruno*, 2016 WL 1057041 at *11-12 (finding probable cause to arrest where "[e]ven if [plaintiff's] statements [to the arresting officer] could be construed as protected speech, they were accompanied by [p]laintiff's continued disregard of police officers' directives to state her

name, calm down, and back away from the [police] line."); *cf.*
*also United States v. O'Brien*, 391 U.S. 367, 376 (1968) ("This
Court has held that when 'speech' and 'nonspeech' elements are
combined in the same course of conduct, a sufficiently important
governmental interest in regulating the nonspeech element can
justify incidental limitations on First Amendment freedoms.")

Accordingly, the complaint fails to state a First
Amendment claim under section 1983 against the individual
officers because the allegations in the complaint do not
"demonstrate that [plaintiff's] conduct is deserving of First
Amendment protection," nor that the individual defendants'
conduct was "motivated by or substantially caused by his
exercise of free speech." *Rattner*, 930 F.2d at 208 (2d Cir.
1991). Additionally, the complaint fails to state a First
Amendment claim under section 1983 against Officer Ryan because
it does not allege that he was personally involved in the
relevant events. The complaint's section 1983 First Amendment
claim must therefore be, and is, dismissed.

Alternatively, based on the authority discussed above,
a reasonable officer could conclude, based on the circumstances
known to the individual defendants at the time of the relevant
events, that Officer Anderson's initial order that plaintiff
step back three to five feet, and subsequent order that
plaintiff leave the scene, which followed plaintiff's defiance

of the initial order and other disruptive conduct, were lawful.

A reasonable officer could further conclude that it was lawful

to arrest plaintiff for refusing to obey an order to retreat,

and to leave the scene, and otherwise disrupting the individual

defendant officers' performance of their official duties as a

crowd of twenty-five to thirty onlookers continued to grow to

thirty to forty individuals.  (Compl. at ¶¶ 27, 42, 93.)

Therefore, as an alternative holding, the individual defendant

officers are entitled to qualified immunity with respect to

plaintiff's section First Amendment claim.

### ii.  False Arrest and False Imprisonment

Plaintiff's fourth cause of action alleges that

plaintiff's "apprehension, arrest, detention and imprisonment"

were "wrongful, unjustifiable, and unlawful."  (Compl. at ¶¶

232-33.)  "In analyzing Section 1983 claims for false arrest,

courts 'generally look to the law of the state in which the

arrest occurred.'"  *Ying Li v. City of New York*, 246 F. Supp. 3d

578, 600 (E.D.N.Y. 2017) (quoting *Dancy v. McGinley*, 843 F.3d

93, 107 (2d Cir. 2016)).  For purposes of the instant action,

"[a] claim for false arrest under [s]ection 1983, resting on the

Fourth Amendment right to be free from unreasonable seizures,

including arrest without probable cause, is substantially the

same as that under New York law."  *Id.* (citing *Jenkins v. City

of New York*, 478 F.3d 76, 84 (2d Cir. 2007)).

To prevail on a New York law false arrest claim, "a plaintiff must establish, *inter alia*, that 'the defendant intentionally confined him without his consent and without justification.'" *Id.* (quoting *Dancy*, 843 F.3d at 107). Additionally, "[i]n New York, the tort of false arrest is synonymous with that of false imprisonment," *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991) (citations omitted), and therefore the court's analysis is equally applicable to both claims. *See Ying Li*, 246 F. Supp. 3d at 600 n.13 (declining to address plaintiff's false imprisonment claim separately from plaintiff's false arrest claim because the causes of action are "synonymous").

"'The existence of probable cause' for an arrest 'is an absolute defense to a false arrest claim.'" *Dancy*, 843 F.3d at 107 (quoting *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006)); *see also Greenaway v. Cty. of Nassau*, 97 F. Supp. 3d 225, 233 (E.D.N.Y. 2015) ("Probable cause is a complete defense to both Fourth Amendment and New York State law claims of false imprisonment." (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996))).[15]

---

[15]    The court notes that although the complaint alleges that plaintiff was confined until arraignment, (Compl. at ¶¶ 103-105), probable cause for his arrest would also establish probable cause for his confinement even if the torts of false arrest and false imprisonment were not "synonymous."

Probable cause to arrest exists where the information available to the arresting officer is "sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (quoting *O'Neill v. Town of Babylon*, 986 F.2d 646, 650 (2d Cir. 1993)). "[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause," and therefore, the officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (citations omitted).

Further, because qualified immunity protects officers who reasonably believe their conduct to be lawful, the existence of "arguable probable cause" establishes a qualified immunity defense. *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (citations omitted). Arguable probable cause exists "if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (citations omitted); *see also Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002) ("[I]n situations where an officer may have reasonably but mistakenly concluded

that probable cause existed, the officer is nonetheless entitled to qualified immunity." (citing *Lennon*, 66 F.3d at 423)).

Here, because the facts known to the officers as alleged in the complaint suffice to establish probable cause to arrest plaintiff for obstruction of governmental administration in violation of New York Penal Law § 195.05, plaintiff fails to state a section 1983 false arrest or false imprisonment claim. *See Jaegly*, 439 F.3d at 154 ("Following *Devenpeck*, . . . a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest."); *see also Devenpeck*, 543 U.S. at 153 ("[An arresting officer's] subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.")

New York Penal Law § 195.05 defines the crime of obstructing governmental administration in the second degree and provides, in relevant part, that

> A person is guilty of obstructing governmental administration in the second degree when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act . . . .

N.Y. Penal Law § 195.05.

The offense has four elements: "(1) prevention or attempt to prevent (2) a public servant from performing (3) an official function (4) by means of intimidation, force or interference." *Cameron v. City of New York*, 598 F.3d 50, 68 (2d Cir. 2010) (quoting *Lennon* 66 F.3d at 424). New York courts have confirmed that the fourth element requires physical interference, though the interference can be minimally physical, and "inappropriate and disruptive conduct at the scene of the performance of an official function" will suffice. *Basinski*, 706 .F. App'x at 698 (quoting *Kass*, 864 F.3d at 209, and collecting cases). For example, in *Davan L.*, the New York Court of Appeals affirmed a finding that, where a juvenile had been "put on specific, direct notice" of a "confined and defined" area of police activity and told to keep away, and the juvenile "intentionally intruded himself into the area" to warn others of police presence, the juvenile's conduct met the elements of obstruction of governmental administration. *See Davan L.*, 91 N.E.2d at 910-11.

Similarly, in *Kass*, the plaintiff had been walking on a sidewalk that was being used by pedestrians in downtown Manhattan. 864 F.3d at 208. The sidewalk was adjacent to a protest site. *Id.* The plaintiff began speaking with protestors

and, after "a minute or two," officers directed him to either keep walking or enter the park to continue his conversation. *Id.* at 209. He "verbally and physically refused to obey the officers' orders either to 'keep walking' or join the protestors inside the park," and was arrested. *Id.* at 210. In a subsequent lawsuit against the officers, the Second Circuit reversed the district court's denial of a motion for judgment on the pleadings based on qualified immunity and held that the officers had at least arguable probable cause to arrest the plaintiff for obstructing governmental administration in violation of New York Penal Law § 195.05. *Id.* at 203.

Here, over the course of fifteen minutes, during which a crowd of onlookers continued to grow from twenty-five to forty individuals, (Compl. at ¶¶ 27, 42, 93), Officer Anderson ordered plaintiff to step back. (Compl. at ¶¶ 37, 40.) As discussed above, under the circumstances alleged, this order was proper. Plaintiff initially complied with that order, (*id.* at ¶ 39), but then disobeyed it by walking back toward the location where the individual defendants were performing their official functions by searching a vehicle and detaining an individual. (*Id.* at ¶¶ 42-44.) Plaintiff's noncompliance with that order caused Officer Del Villar and eventually Officer Anderson to cease the performance of their official duties to address plaintiff. (*Id.* at ¶¶ 45-62.) Officer Anderson then ordered plaintiff to leave

the scene.  (*Id.* at ¶ 63.)  As discussed above, this order was

lawful.  Plaintiff communicated his intent to disobey the order,

and in fact disobeyed it.  (*Id.* at ¶¶ 65-66.)  Taken as a whole,

and even when viewed in the light most favorable to plaintiff,

plaintiff's factual allegations establish probable cause for his

arrest.  Because probable cause is an absolute defense to a

false arrest claim and to a false imprisonment claim,

plaintiff's false arrest and false imprisonment claims fail and

must be dismissed.

Further, to the extent plaintiff's false arrest and

false imprisonment claims can be construed as retaliation claims

under the First Amendment and section 1983, the court notes that

the existence of probable cause will defeat a First Amendment

retaliation claim.  *See*, *e.g.*, *Fabrikant v. French*, 691 F.3d

193, 215 (2d Cir. 2012) ("The existence of probable cause . . .

will also defeat a First Amendment claim that is premised on the

allegation that defendants prosecuted a plaintiff out of a

retaliatory motive."); *Mozzochi v. Borden*, 959 F.2d 1174, 1180

(2d Cir. 1992) ("An individual does not have a right under the

First Amendment to be free from a criminal prosecution supported

by probable cause, [even if it] is in reality an unsuccessful

attempt to deter or silence criticism of the government.");

*Norton v. Town of Islip*, 97 F. Supp. 3d 241, 257 (E.D.N.Y. 2015)

("Even if [plaintiff] had stated a plausible claim against

[defendants], the Court would still dismiss [plaintiff's] First
Amendment retaliation claim because the appearance tickets
against [plaintiff] were supported by probable cause.").  The
existence of probable cause therefore requires dismissal to the
extent plaintiff alleges a First Amendment retaliation claim in
connection with his arrest and confinement pending arraignment.

As an alternative holding, based on the authorities
discussed above, there was at least arguable probable cause to
arrest plaintiff and confine him pending arraignment.  The
individual defendants are therefore entitled to qualified
immunity with respect to plaintiff's arrest and confinement, and
his section 1983 Fourth Amendment false arrest and false
imprisonment claims and First Amendment retaliation claim are
dismissed.

### iii. Malicious Prosecution

Plaintiff's fifth cause of action asserts a section
1983 malicious prosecution claim against all individual
defendants.  (Compl. at ¶¶ 237-47.)  "[I]n recognizing a
malicious prosecution claim when the prosecution depends on a
violation of federal rights, [section 1983] adopts the law of
the forum state so far as the elements of the claim for
malicious prosecution are concerned."  *Cornejo v. Bell*, 592 F.3d
121, 129 (2d Cir. 2010) (citation omitted).  Accordingly, where
New York is the forum state, "[t]o allege a [s]ection 1983 claim

for malicious prosecution, a plaintiff must allege the four
elements of a malicious prosecution claim under New York law –
'(1) the initiation or continuation of a criminal proceeding
against plaintiff; (2) termination of the proceeding in
plaintiff's favor; (3) lack of probable cause for commencing the
proceeding; and (4) actual malice as a motivation for
defendant's actions' — as well as a violation of the plaintiff's
rights under the Fourth Amendment." *Ying Li*, 246 F. Supp. 3d at
604 (quoting *Manganiello v. City of New York*, 612 F.3d 149, 160–
61 (2d Cir. 2010)); *see also Boyd v. City of New York*, 336 F.3d
72, 76 (2d Cir. 2003) ("To succeed on a claim for malicious
prosecution, the plaintiff must show that a prosecution was
initiated against him, that it was brought with malice but
without probable cause to believe that it could succeed and that
the prosecution terminated in favor of the accused plaintiff."
(citations omitted)).

A plaintiff alleging retaliatory malicious prosecution
on a First Amendment theory must also allege the absence of
probable cause, as "'[a]n individual does not have a right under
the First Amendment to be free from a criminal prosecution
supported by probable cause,' even if that prosecution 'is in
reality an unsuccessful attempt to deter or silence criticism of
the government.'" *Fabrikant* 691 F.3d at 215 (2d Cir. 2012)
(quoting *Mozzochi* 959 F.2d at 1180).

Probable cause for purposes of malicious prosecution is different from probable cause for arrest. *Ying Li*, 246 F. Supp. 3d at 611 (citing *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999)). Probable cause to prosecute exists where there are "such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd*, 336 F.3d at 76.

As an initial matter, "[t]o initiate or continue a criminal proceeding, 'a defendant must do more than report the crime or give testimony. He must play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.'" *Ying Li*, 246 F. Supp. 3d at 605 (quoting *Manganiello,* 612 F.3d at 163). "An active role in prosecution is inferred when a defendant had the plaintiff arraigned, filled out a complaining and corroborating affidavit, or signed a felony complaint." *Id.* (citations omitted).

Here, the only allegation that, if true, would establish that any individual defendants personally played an active role in plaintiff's prosecution is the allegation that Officer Ryan, informed by Officer Anderson, executed a criminal complaint against plaintiff.[16] (Compl. at ¶¶ 98-99.)

---

[16] The court reaches the conclusion that Officer Ryan's criminal complaint forms the sole factual basis for the alleged malicious prosecution because malicious prosecution "implicate[s] post-arraignment deprivations of liberty," *Singer*, 63 F.3d at 117, and none of the allegations in the complaint relating to post-arraignment events personally involve the

Plaintiff's complaint does not allege any personal involvement by Officer Del Villar in the initiation or continuation of plaintiff's criminal prosecution other than a vague and conclusory allegation that "the [individual defendants] acting in concert, lied to the Queens [County] District Attorney's Office . . . by providing false statements with regard to what transpired during the arrest of plaintiff." (*Id.* at ¶ 97.) As such, the complaint does not state a malicious prosecution claim against Officer Del Villar.

Further, although an arresting officer may be held liable for malicious prosecution where the officer provides prosecutors with false information, *see Ying Li*, 246 F. Supp. 3d at 605-06, a significant portion of Officer Ryan's complaint, as recited in the complaint here, consists of statements that find ample support in plaintiff's recital of the events of November 19, 2014 in the instant complaint. (*Compare* Compl. at ¶ 99 (Officer Ryan's description of events) *with* Compl. at ¶¶ 25-82 (plaintiff's description of events).)

Moreover, plaintiff's allegations as to the criminal complaint's falsity are conclusory and as such do not adequately plead a lack of probable cause. For instance, plaintiff alleges that the criminal complaint states as follows:

---

defendant officers. The criminal complaint therefore forms the sole aspect of plaintiff's prosecution in which any defendant officers were involved.

Deponent further states that he is informed by
[P]olice [O]fficer Anderson that when he was
attempting to place handcuffs on [Leibovitz, he]
flailed his arms and grabbed [P]olice [O]fficer
Anderson's hand and lunged forward into a metal
gate striking [P]olice [O]fficer Anderson's hand
onto said metal gate in an attempt to avoid being
handcuffed and placed under arrest.

(*Id.* at ¶ 99.)

   and

Deponent further states that he is informed by
Police Officer Anderson that the above mentioned
actions of the defendant caused him to sustain
lacerations to his hand, substantial pain and
that he was treated at a local area hospital for
said injuries where he is awaiting X-Rays on his
hand.

(*Id.*)

   As noted above, plaintiff's own complaint alleges that

the criminal complaint states that Officer Anderson asked

plaintiff to step back multiple times, that plaintiff refused

and began to yell and curse, causing a crowd to gather, and that

plaintiff refused to provide identification when asked.  (*Id.*)

   Plaintiff's complaint generally alleges that the

criminal complaint, including those statements that plaintiff's

own allegations clearly support, was falsified.  (*Id.* at ¶ 101.)

To the extent plaintiff's allegations do not affirmatively

support the statements in the criminal complaint, plaintiff's

complaint contains sparse and in some cases conclusory

allegations regarding the actual effectuation of his arrest, in

notable contrast to its lucid and fulsome descriptions of a

number of the events that transpired in the late afternoon hours of November 19, 2014. (*See, e.g. id* at ¶ 27 (describing scene at the intersection of 84th Drive and Queens Boulevard upon plaintiff's arrival); ¶¶ 42-63 (describing plaintiff's decision to walk closer to scene to videotape certain aspects and subsequent confrontation with Officers Anderson and Del Villar); ¶¶ 77-91 (recounting, in relevant part, conversations with defendant officers and an unidentified supervisor following plaintiff's arrest).)

As to pre-arrest events, plaintiff's complaint establishes that Officer Anderson asked him to step back twice, the first time in general terms and the second time to a specific area approximately three to five feet from where plaintiff was standing. (Compl. at ¶¶ 37-40.) Plaintiff's complaint also establishes that his dialogue with the officers, during which he called the officers "pigs," took place from a distance of several feet, as he was far enough away that Officer Del Villar had to "walk towards" plaintiff to reach him after he disobeyed Officer Anderson's direction to move back. (*See Id.* at ¶¶ 43-57.) Plaintiff also alleges that he disobeyed Officer Anderson's subsequent direction to leave, after plaintiff had returned to the location of the search and asked a bystander if they "should have [the officers] arrested." (*Id.* at ¶¶ 51, 63-65.) These allegations provide support for the criminal

complaint's statements that plaintiff refused the order to step back and began to yell and curse.

Further, plaintiff's complaint alleges that he "enforced the general public's frustration with the NYPD and their abuse of power," (*id.* at ¶ 78), thus suggesting that his own actions caused a crowd to gather. The complaint alleges that plaintiff provided his name, but does not allege whether the officers asked him for identification and whether he complied by providing identification. Similarly, the only allegations regarding the actual effectuation of plaintiff's arrest are that the individual defendants "bum rushed" plaintiff and did not direct him to put his hands behind his back, (*Id.* at ¶¶ 67-68), that Officer Anderson, at some point, said "oh no, I have a cut now, we have you for assault," (Compl. at ¶ 71), and a conclusory statement that plaintiff "did not resist the arrest **nor did he assault anyone**." (Compl. at ¶ 73 (emphasis in original).)

Plaintiff's complaint does not plead any non-conclusory allegations of fact that, if true, could sufficiently state a claim that the assertions in the criminal complaint regarding the effectuation of plaintiff's arrest were false and, consequently, that probable cause was lacking for his prosecution for the offenses of assault in the second degree, obstruction of governmental administration, and resisting

arrest.[17]  Instead, plaintiff's complaint either supports or is
silent as to the statements in the criminal complaint, including
those relating to the actual effectuation of the arrest, and
merely relies on conclusory allegations that Officer Ryan's
criminal complaint contained one or more false statements.[18]
Plaintiff's allegations are precisely the kind of "unadorned,
the-defendant-unlawfully-harmed-me accusation[s]" and "naked
assertions devoid of further factual enhancement" that the
Supreme Court has concluded will not suffice to state a claim.
*Iqbal*, 556 U.S. at 678 (citations and quotations omitted).

---

[17]    The allegations discussed in the portion of this order addressing the
existence of probable cause to arrest, also establish probable cause, or at
least arguable probable cause, to prosecute for obstruction of governmental
administration.  Additionally, under New York law, one commits assault in the
second degree when, "[w]ith intent to prevent . . . a police officer . . . in
the course of performing an essential service, from performing a lawful duty
. . . he or she causes physical injury to such . . . police officer."  N.Y.
Penal Law § 120.05(3).  Additionally, "[a] person is guilty of resisting
arrest when he intentionally prevents or attempts to prevent a police officer
or peace officer from effecting an authorized arrest of himself or another
person."  N.Y. Penal Law § 205.30.  The allegations in Officer Ryan's
criminal complaint, as alleged in plaintiff's complaint, would establish
probable cause to prosecute plaintiff for these offenses, and as discussed
herein, plaintiff has not sufficiently pleaded factual allegations that would
establish the falsity of Officer Ryan's complaint.

[18]    The complaint also alleges that plaintiff's attorney in the criminal
proceedings told plaintiff that the assistant district attorney handling the
case "doesn't trust [Officer] Anderson," (Compl at ¶ 121), and that the
assistant district attorney reduced the assault charge from a felony to a
misdemeanor and offered plaintiff an adjournment in contemplation of
dismissal.  (Compl. at ¶ 122.)  Plaintiff contends that this establishes the
falsity of Officer Anderson's statements as set forth in Officer Ryan's
criminal complaint.  (Opp. at 9.)  Plaintiff is mistaken, as even if these
allegations are true, they are would not necessarily establish that the
criminal complaint was falsified.  Instead, plaintiff's allegations are
merely "consistent with liability," but also with a wide range of non-
actionable conduct, and as such do not suffice to state a claim.  *See Iqbal*,
556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent
with a defendant's liability, it stops short of the line between possibility
and plausibility of entitlement to relief." (internal quotations and
citations omitted)).

Because plaintiff's complaint does not adequately plead a lack of probable cause for plaintiff's prosecution, and pleads insufficient facts that the officers were motivated by actual malice, it fails to state a section 1983 claim for malicious prosecution, whether on a First Amendment or Fourth Amendment theory.  Accordingly, plaintiff's claim for malicious prosecution under section 1983 is dismissed.

### iv.  **Malicious Abuse of Process**

"In order to establish liability for malicious abuse of process under [section] 1983, a plaintiff must establish the claim's elements under state law as well as the deprivation of a constitutional right."  *Hoffman v. Town of Southampton*, 893 F. Supp. 2d 438, 446 (E.D.N.Y. 2012) (citing *Cook v. Sheldon*, 41 F.3d 73, 79-80 (2d Cir. 1994)), *aff'd sub nom. Peter L. Hoffman, Lotte, LLC v. Town of Southampton*, 523 F. App'x 770 (2d Cir. 2013).  To establish a malicious abuse of process claim under New York law, a plaintiff must show that the defendant has "(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse o[r] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process."  *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (quoting *Cook*, 41 F.3d at 80).

The third element, which requires a collateral objective, is "[t]he crux of a malicious abuse of process claim." *Douglas v. City of New York*, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009). To allege this element, "it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino*, 331 F.3d at 77; *see also, e.g., Curiano v. Suozzi*, 469 N.E.2d 1324, 1326 (N.Y. 1984) ("A malicious motive alone . . . does not give rise to a cause of action for abuse of process." (citation omitted)). Put differently, "abuse of process resembles a form of extortion, by which the defendant invokes legal process to coerce the plaintiff into doing something other than what the process necessitates." *Folk v. City of New York*, 243 F. Supp. 3d 363, 375 (E.D.N.Y. 2017) (quoting *Krebs v. United States*, No. 98-CV-2590(MBM), 1999 WL 185263 at *5 (S.D.N.Y. Mar. 31, 1999)).

As another court in this district has observed, "[t]ypical scenarios in which courts in this circuit have sustained a claim of malicious abuse of process involve prosecutions for reasons wholly outside of the initial prosecution." *Hoffman*, 893 F. Supp. 2d at 448. For instance, courts have concluded that the collateral objective requirement

49

could be satisfied where "the defendant allegedly arrested the plaintiff for trespassing in order to influence a collateral contract dispute," *id.* (citing *TADCO Construction Corp. v. Dormitory Authority of the State of New York*, 700 F. Supp. 2d 253, 272 (E.D.N.Y. 2010)), as well as where a defendant allegedly fabricated assault charges in order to save his job because "safeguarding one's own employment lies outside the legitimate goal of criminal process." *See Hernandez v. Wells*, No. 01-CV-4376(MBM), 2003 WL 22771982, at *8-9 (S.D.N.Y. Nov. 24, 2003).

On the other hand, the Second Circuit in *Savino* found insufficient an allegation that the plaintiff's investigation and arrest by the defendants "was solely motivated to seek vindication for the City's great political embarrassment and humiliation for allowing plaintiff to be the highest paid city employee through his overtime earning which was widely reported in news media for several years and to punish plaintiff for his lawfully and properly earned overtime compensation." 331 F.3d at 77-78 (quoting the complaint in that action). The Second Circuit reached this conclusion because the above-quoted passage alleges an "improper *motive*," and noted that the plaintiff had presented no evidence of "ulterior *purpose* or *objective* in facilitating his prosecution." *Id.* at 78 (emphasis in original). The Second Circuit thus concluded that the plaintiff

had "failed to state a claim for abuse of process . . . and [the defendants] are entitled to summary judgment on the abuse of process claim.  And because defendants are entitled to summary judgment on the merits of the abuse of process claim, they are also entitled to summary judgment on qualified immunity grounds with respect to this claim."  *Id.* (citation omitted).  The Second Circuit therefore and reversed the district court's denial of summary judgment and remanded with instructions to enter judgment in favor of defendants.  *Id.*

Similarly, the Second Circuit has noted that an assertion that a defendant commenced prosecution "to punish [plaintiff] for exercising his right to bear arms is a mere allegation of a retaliation motive, not a collateral objective." *Arrington v. City of New York*, 628 F. App'x 46, 49-50 (2d Cir. 2015) (summary order).

Here, plaintiff alleges defendants arrested him and initiated his prosecution "[i]n retaliation" for exercising his First Amendment rights.  (Compl. at ¶ 62.)  Thus, like the plaintiffs in *Savino* and *Arrington*, plaintiff here merely alleges a retaliatory motive.  He does not allege an improper collateral objective outside the scope of the process issued – that is, a purpose other than to arrest and prosecute plaintiff,

and which ulterior purpose is unrelated to his arrest and prosecution.[19]

Alternatively, even if plaintiff had alleged an improper collateral objective with respect to his arrest, on the facts alleged, the defendant officers are entitled to qualified immunity with respect to the arrest. This entitlement arises because, as discussed *supra*, probable cause, or alternatively arguable probable cause, existed for the arrest, and a reasonable officer could believe that probable cause is a complete defense to an abuse of process claim under New York law. *See Mangino v. Inc. Vill. of Patchogue*, 808 F.3d 951, 958-59 (2d Cir. 2015) (affirming district court dismissal of malicious abuse of process claim because the "very existence" of "confusion within [the Second] Circuit regarding whether probable cause is a complete defense to a claim of abuse of process under New York law" established defendant's entitlement to qualified immunity).

---

[19]     The exact wording of the complaint's allegation is as follows:  "In retaliation against Mr. Leibovitz's exercise of his constitutionally protected speech by recording them, the [criminal] proceeding was instituted to interfere with, and chill, the exercise of free speech and association." (Compl. at ¶ 62.)  This can colorably be read to allege that the defendant officers sought to chill plaintiff's prospective exercise of his first amendment rights.  To find, however, that this allegation suffices to allege an improper collateral objective would effectively allow a "retaliatory motive" allegation to be repackaged as an "improper collateral objective" allegation by making a conclusory suggestion that the retaliation was intended to, and might actually, influence future conduct.  Accordingly, the court concludes that plaintiff has not alleged an improper collateral objective.

### v.  *Brady* Claim

The complaint, in passing, alleges that the individual defendants violated plaintiff's right "[t]o timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963)."  (Compl. at ¶ 242.)  The complaint, however, is devoid of any allegations that would support a conclusion that any of the individual defendants (as opposed to the Queens County District Attorney's Office) was obligated to turn over *Brady* material to plaintiff and impermissibly failed to do so, or otherwise interfered with his right to receive such materials.  Therefore this claim fails and is dismissed.

### B.  Section 1983 Claims Against the City (*Monell* Claims)

A municipality may be liable as a "person" under section 1983 if it is "responsible for a deprivation of rights protected by the Constitution," though for purposes of section 1983, "a municipality cannot be held liable *solely* because it employs a tortfeasor – or, in other words . . . on a *respondeat superior* theory."  *Monell*, 436 U.S. at 690-91 (emphasis in original).  Instead, a plaintiff seeking to hold a municipality liable under section 1983 must "identify a municipal policy or custom that caused the plaintiff's injury."  *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403 (1997) (internal quotations and citations omitted).  "The plaintiff must also

demonstrate that, through its deliberate conduct, the

municipality was the moving force behind the injury alleged.

That is, a plaintiff must show that the municipal action was

taken with the requisite degree of culpability and must

demonstrate a direct causal link between the municipal action

and the deprivation of federal rights." *Id.* (internal quotation

marks, citations, and emphasis omitted).

Plaintiff appears to assert the existence of two

municipal policies or customs that resulted in the violation of

his constitutional rights: a practice and custom of interfering

with the right of individuals to peaceably record police

activity, (*see* Compl. at ¶ 209), and a practice and custom of

investigating allegations of misconduct against its own

officers. (*See id.* at ¶ 223.)

### i.   Interference with Plaintiff's Right to Record Police Officers

Plaintiff's complaint alleges that the New York Police

Department's patrol guide expressly provides that "[a]s a rule,

when a police officer stops, detains, or arrests a person in a

public area, persons who happen to be in or are attached to the

area are naturally in position to and are allowed to observe the

police officer's actions." (Compl. at ¶ 207.) Plaintiff

further alleges that the patrol guide provides that "[t]aking

photographs, videotapes, or tape recordings" of officers does

not, in and of itself, constitute "probable cause for arrest or detention of an onlooker." (*Id.*) Thus, plaintiff does not assert the existence of an *express* policy of *affirmatively* violating constitutional rights, but instead, he alleges a policy of tolerating the violation of constitutional rights in contravention of express City policy – in other words, a failure to act and/or to properly train its employees.

"*Monell's* policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). Further, "such a failure to act, train, or supervise can constitute a municipal custom 'only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Triano v. Town of Harrison, N.Y.*, 895 F. Supp. 2d 526, 534 (S.D.N.Y. 2012) (quoting *Reynolds*, 506 F.3d at 192)).

Consistent with these principles, the Second Circuit has set out a three-part test for establishing that a failure to train constitutes deliberate indifference:

> First, the plaintiff must show that a policymaker
> knows to a moral certainty that her employees
> will confront a given situation.  Second, the
> plaintiff must show that the situation either
> presents the employee with a difficult choice of
> the sort that training or supervision will make
> less difficult or that there is a history of
> employees mishandling the situation. Finally, the
> plaintiff must show that the wrong choice by the
> city employee will frequently cause the
> deprivation of a citizen's constitutional rights.

*Jenkins v. City of New York*, 478 F.3d 76, 94 (2d Cir. 2007)

(internal quotations and citations omitted).

The complaint refers to several instances in which

individual police officers allegedly violated individuals' First

Amendment right to record police officers in public, but is

largely silent as to the City's reaction to those instances.

(*See* Compl. at ¶ 209.)  More specifically, other than the

allegations as to the City's treatment of plaintiff's

allegations against the defendant officers, the complaint

contains only two factual allegations regarding the actions of

the City or its employees with respect to alleged First

Amendment violations.  The first of these allegations is that an

unidentified lawyer for the City stated that "[t]he NYPD's

policy is clear.  Bystanders are allowed to film police officers

as long as they're not interfering with officers' duties and/or

police operations."  (*Id.*)  The second of these allegations is

that, on one occasion in 2012, an officer arrested a woman for

recording him, but released her when a superior officer told the

arresting officer that the woman had not violated any laws by recording.  (*Id.*)  Both allegations undermine plaintiff's assertion that the City maintains a policy of tolerating First Amendment violations by police officers, and suggest that the City is not indifferent to such violations.

Other than two allegations that militate *against* his *Monell* claim, plaintiff has merely alleged that a dozen or so officers have violated the City's stated policy regarding filming police officers over a period of several years.  (*Id.*) This is not equivalent to alleging that the City has *tolerated* such violations.  Plaintiff, therefore, has not provided any non-conclusory allegations of fact that would support an inference that the City "has a custom or practice of tolerating police [misconduct], or of failing to discipline and supervise miscreant police officers."  *Triano*, 895 F. Supp. 2d at 535. Instead, plaintiff relies on repetitive assertions that the City insufficiently trained the defendant officers, (Compl. at ¶ 210, 211, 216, 217), "acted with deliberate indifference to the rights of individuals," (*Id.* at ¶ 214; *see also id.* at 211, 217), and condoned or tacitly ratified or authorized officers' improper actions.  (*Id.* at ¶¶ 213, 214.)  Plaintiff merely offers "naked assertions devoid of further factual enhancement," and such assertions do not suffice to state a claim.  *Iqbal*, 556 U.S. at 677-78 (citations and quotations omitted).

### ii.   Investigation of Complaints of Officer Misconduct

The complaint states that "[t]he NYPD maintains a policy, practice and custom in which the NYPD is allowed to investigate itself and decide if the actions of its own employees are justified.  At no point in history has this policy ever brought the truth to light and any form of justice to the victims."  (Compl at ¶ 223.)  Plaintiff alleges that the City's policy violates the privileges and immunities clause of the Fourteenth Amendment to the United States Constitution.  The court, however, cannot locate any authority supporting the proposition that the Fourteenth Amendment, or any other constitutional provision, precludes a municipal police force from investigating allegations of misconduct against its own members.  As such, plaintiff's assertion that the New York Police Department maintains a policy, practice, and custom of investigating reports of misconduct by its own officers, when taken as true, does not state a claim for the violation of any constitutionally protected right.

Accordingly, plaintiff has failed to state a claim against the City under section 1983, and his claims against the City are dismissed in their entirety.

## II.  State Law Claims

As an initial matter, defendants challenge plaintiff's compliance with New York's notice of claim requirements, which

apply to pendent state law claims in federal court and are
"construed strictly," such that "failure to comply . . .
ordinarily requires dismissal for failure to state a cause of
action." *Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d
789, 793-96 (2d Cir. 1999) (citations omitted) (affirming Rule
12 dismissal where plaintiff failed to plead that she had filed
a notice of claim).

Under New York law, as a precondition to bringing a
state law tort action against a municipality or any employee
thereof, a plaintiff must file a notice of claim within ninety
days after his claim accrues.  N.Y. Gen. Mun. Law § 50-e.
Additionally, New York General Municipal Law section 50-h(1)
provides that the defendant municipality "shall have the right
to demand an examination of the claimant relative to the
occurrence and extent of the injuries or damages for which claim
is made."[20]  Further, if such a demand is made, no action may be
commenced against the defendant municipality unless the
municipality fails to conduct the examination of the claimant
within ninety days, and a claimant's failure to attend a 50-h
examination will bar him from bringing his action until he
complies with section 50-h.  N.Y. Gen. Mun. Law § 50-h(5).

---

[20]    Although section 50-h affords claimants certain rights with respect to
a hearing, including the right to be represented by counsel at the hearing,
it does not appear to afford claimants a reciprocal right to demand a
hearing.  *See* N.Y. Gen. Mun. Law § 50-h.

Importantly, however, although a municipality has a right to demand a hearing, a section 50-h hearing is not required unless a municipality demands one. *See Ramos v. City of New York*, No. 15-CV-6085 (ER), 2017 WL 3267736, at *11 (S.D.N.Y. July 31, 2017) (denying summary judgment where defendant argued plaintiff's state law claims were barred for failure to provide 50-h testimony but nothing in record before the court established that defendant had demanded a 50-h hearing), *on reconsideration*, No. 15-CV-6085 (ER), 2017 WL 3575697 (S.D.N.Y. Aug. 17, 2017).

Plaintiff alleges that, unlike the plaintiff in *Hardy*, he timely filed a Notice of Claim with the Comptroller of the City of New York on December 3, 2014, and another on November 7, 2015. (Compl. at ¶ 13.) Defendants do not dispute this, but have submitted a declaration by one of their attorneys stating that "[u]pon information and belief, plaintiff failed to attend a hearing pursuant to . . . [s]ection 50-h in connection with his purported Notice of Claim." (Bahrenburg Declaration, ECF No. 82, at ¶ 8.) However, because the court is adjudicating a motion to dismiss, and because the declaration submitted by defendants' counsel lies outside the scope of the pleadings, the court will not consider the declaration. Moreover, the court finds for defendants on other grounds, and need not consider the declaration.

Viewing the remaining record before the court in the light most favorable to plaintiff, it is not clear that plaintiff was given notice of a section 50-h hearing and failed to attend.  Consequently, the court cannot find, at this stage, that plaintiff has failed to comply with notice of claim requirements under New York law.

Nevertheless, the court addresses each of plaintiff's state law causes of action below, and finds that plaintiff has not stated any claim under state law.  Accordingly, all of plaintiff's state law claims are dismissed.

## A.    Negligence

Plaintiff's eighth cause of action alleges that the City failed to "adequately hire, train, supervise, and discipline its agents, servants and/or employees employed by the NYPD with regard to their aforementioned duties."  (Compl. at ¶ 260.)  Under New York law, "an employer may be held liable for negligent hiring or retention where one of its employees caused injures to a third party when the employer has either hired or retained the employee with knowledge of the employee's propensity for the sort of behavior which caused the injured party's harm."  *Marcano v. City of Schenectady*, 38 F. Supp. 3d 238, 267 (N.D.N.Y. 2014) (internal quotations and citations omitted); *accord Borden v. Capital Dist. Transp. Auth.*, 763 N.Y.S.2d 860, 862 (N.Y. App. Div. 2003).  Additionally, "[a]

municipality may be held liable for negligently training or supervising its law enforcement officers."  *Marcano*, 38 F. Supp. 3d at 268 (citing *Barr v. Cty. of Albany*, 406 N.E.2d 481, 485 (N.Y. 1980).

Here, however, plaintiff does not allege any facts at all regarding the hiring, retention, or training of Officers Anderson, Del Villar, and Ryan, much less any facts that would tend to show that the City was negligent in such hiring, retention, and/or training.  Accordingly, he fails to state a claim for negligence and the claim is dismissed.

**B.   Violation of Rights under New York State Constitution**

Plaintiff's ninth cause of action alleges that the individual defendants deprived him of his rights under article I, section 8 of the New York State Constitution, (Compl. at ¶ 263), which provides, in relevant part, that "[e]very citizen may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press."

However, "various federal courts in this circuit have held that 'there is no private right of action under the New York State Constitution where . . .  remedies are available under [section] 1983.'"  *G.D.S. ex rel. Slade v. Northport-E. Northport Union Free Sch. Dist.*, 915 F. Supp. 2d 268, 280

(E.D.N.Y. 2012) (quoting *Clayton v. City of Poughkeepsie*, No. 06-CV-4881(SCR), 2007 WL 2154196, at *7 (S.D.N.Y. June 21, 2007) and collecting cases). Here, plaintiff's claim under article 1, section 8 of the New York State Constitution is identical to his dismissed claim under the First Amendment to the United States Constitution, and thus, the former claim is also dismissed. *See id.* ("[B]ecause all state constitutional law claims are also asserted as Section 1983 claims, all such [state law] claims are dismissed." (quoting *Krug v. County of Rennselaer*, 559 F. Supp. 2d 223, 248 (N.D.N.Y. 2008))).

### C.  False Arrest and False Imprisonment

Plaintiff's tenth cause of action alleges false imprisonment and false arrest under New York law against the individual defendants.  (Compl. at ¶¶ 266-272.)  As noted in the court's discussion of plaintiff's section 1983 false arrest and false imprisonment claims, "[a] claim for false arrest under [s]ection 1983 . . . is substantially the same as that under New York law," *Ying Li*, 246 F. Supp. 3d at 600 (citation omitted), and probable cause is therefore an absolute defense. *Dancy*, 843 F.3d at 107 (quoting *Jaegly*, 439 F.3d at 152).  Further, false arrest and false imprisonment are "synonymous" under New York law, *Posr*, 944 F.2d at 96, and therefore the court's federal section 1983 false arrest and false imprisonment analysis is

equally applicable to plaintiff's state law false arrest and false imprisonment claims.

Additionally, "[t]he New York courts recognize the defense of qualified immunity to shield the government official from liability unless that action is taken in bad faith or without a reasonable basis." *Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 364 (2d Cir. 2004) (citations omitted). "This reasonableness standard is the same standard as that applied in federal qualified immunity analysis; thus, where an officer's actions are deemed objectively reasonable, that officer will be immune under both federal and state law." *Mesa v. City of New York*, No. 09-CV-10464(JPO), 2013 WL 31002, at *12 (S.D.N.Y. Jan. 3, 2013) (citing *Jones v. Parmley,* 465 F.3d 46, 64 (2d Cir. 2006)).

The court has concluded that probable cause existed for plaintiff's arrest and his confinement pending arraignment. Therefore, plaintiff fails to state a false arrest claim or a false imprisonment claim under New York law, and those claims are dismissed.

Alternatively, the individual defendant officers' actions in arresting and detaining plaintiff were objectively reasonable because, even viewing the facts alleged in the complaint in the light most favorable to the plaintiff, arguable probable cause existed for the arrest. Consequently, the

defendant officers are entitled to qualified immunity under New York law, requiring dismissal of plaintiff's state law false arrest and false imprisonment claims.

### D. Malicious Prosecution

Plaintiff's eleventh cause of action alleges malicious prosecution under New York law against the individual defendants.  (Compl. at ¶ 275-78.)  In addressing plaintiff's malicious prosecution claim under section 1983, the court has already concluded that plaintiff has failed to plead the elements of malicious prosecution under New York law.  To reiterate, the complaint does not adequately plead a lack of probable cause for plaintiff's prosecution and also fails to plead that the defendant officers' conduct was motivated by actual malice.  As noted above, the complaint is devoid of nonconclusory allegations of material fact that, if proven, could establish the falsity of the statements in the criminal complaint against him, which statements in turn established the probable cause for his prosecution.  Similarly, the complaint is devoid of facts that plausibly allege that the officers were motivated by actual malice.  Therefore, plaintiff's New York law malicious prosecution claim is dismissed.

### E. Assault and Battery

Plaintiff's twelfth cause of action alleges assault and battery under New York law against the individual defendants

in connection with plaintiff's arrest.  (Compl. at ¶¶ 284-85.)
To prevail on a state law assault and battery claim against a
police officer in connection with the effectuation of an arrest,
"a plaintiff must ultimately demonstrate that the defendant's
use of force was 'objectively unreasonable in light of the facts
and circumstances confronting [him], without regard to their
underlying intent or motivation.'"  *Hulett v. City of Syracuse*,
253 F. Supp. 3d 462, 491 (N.D.N.Y. 2017) (quoting *Hershey v.
Goldstein*, 938 F. Supp. 2d 491, 519 (S.D.N.Y. 2013)).

Here, the complaint does not allege, in form or
substance, that the individual defendants used force that was
objectively unreasonable in effecting plaintiff's arrest.
Therefore, plaintiff's only theory of liability can be that the
arrest itself was not lawful, such that the use of *any* force
constitutes an assault and battery.  *See Id.* at 491 n.9
("[U]nder New York law 'if an arrest is determined to be
unlawful, any use of force against a plaintiff may constitute an
assault and battery, regardless of whether the force would be
deemed reasonable if applied during a lawful arrest.'" (quoting
*Graham v. City of New York*, 928 F. Supp. 2d 610, 624 (E.D.N.Y.
2013))).

Based on the court's determination that probable cause
existed for the arrest, plaintiff does not state a claim for

assault and battery against the individual defendants under New York law, and that claim is dismissed.[21]

Because plaintiff is proceeding *pro se* and the court is obligated to afford his complaint a solicitous reading, the court notes one additional potential basis for an assault claim. Under New York law, a person commits assault when he "intentional[ly] plac[es] . . . another person in fear of imminent harmful or offensive contact." *Williams v. City of New York*, 121 F. Supp. 3d 354, 377 (S.D.N.Y. 2015) (quoting *Green v. City of New York*, 465 F.3d 65, 86 (2d Cir. 2006)). Here, plaintiff alleges that Officer Anderson "threw something at [him]." (Compl. at ¶ 46.) Although throwing an object at another might constitute an assault, here, the complaint includes no factual detail as to what the object was, how close it came to plaintiff, or how plaintiff reacted to it. Accordingly, plaintiff's allegation that Officer Anderson "threw something at" plaintiff does not suffice to state an assault claim under New York law.

---

[21] Even if there were not actual probable cause, there was at least arguable probable cause for the individual defendants to arrest plaintiff, and the arrest was therefore objectively reasonable. Consequently, the individual defendants are entitled to qualified immunity, and plaintiff's assault and battery claim must be dismissed as against them on qualified immunity grounds. *See Lepore v. Town of Greenburgh*, 992 N.Y.S.2d 329, 331 (N.Y. App. Div. 2014) (noting that where an officer's actions in effecting an arrest are objectively reasonable, the officer is entitled to qualified immunity and collecting cases).

**F.    Intentional Infliction of Emotional Distress**

Plaintiff's thirteenth cause of action is styled as one for intentional infliction of emotional distress, though it alleges that the conduct of the individual defendants, "in assaulting and battering [p]laintiff on November 19th, 2014, and signing a false [f]elony [c]riminal [c]omplaint was careless and negligent as to the emotional health of [p]laintiff and caused severe emotional distress to [p]laintiff."  (Compl. at ¶ 291.) Regardless of whether plaintiff seeks to assert an intentional or negligent infliction of emotional distress claim, however, the allegations in the complaint fall short.

New York has adopted the definition of intentional infliction of emotional distress set forth in the Restatement (Second) of Torts.  *Fischer v. Maloney*, 373 N.E.2d 1215, 1217 (N.Y. 1978).  In relevant part, for liability to arise, the challenged conduct be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society."  *Id.* (quoting Restatement (Second) of Torts § 46, comment d (1965)).  "The conduct must also be intentionally directed at the plaintiff and lack any reasonable justification."  *Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985); *accord Howell v. New York Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993).  Here, the court has found that defendants had

68

probable cause, or at least arguable probable cause, to arrest plaintiff, and as such, their conduct in arresting him is reasonably justified.  Further, with respect to the initiation of criminal proceedings, plaintiff offers only conclusory assertions that the criminal complaint fabricated against him was false.  Accordingly, he has not sufficiently alleged conduct that would give rise to liability for intentional infliction of emotional distress under New York law.

Plaintiff fares no better under a negligent infliction of emotional distress theory.  "Under New York law, a plaintiff may establish such a claim in one of two ways: (1) the 'bystander' theory; or (2) the 'direct duty theory.'"  *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996).  Under the bystander theory, a plaintiff can recover when "(1) []he is threatened with physical harm as a result of defendant's negligence; *and* (2) *consequently* []he suffers emotional injury from witnessing the death or serious bodily injury of a member of her immediate family."  *Id.* (citations omitted).  Plaintiff has not alleged the death or serious bodily injury of an immediate family member, and the bystander theory consequently is not available to him.  "Under the 'direct duty' theory, a plaintiff has a cause of action for negligent infliction of emotional distress if she suffers an emotional injury from defendant's breach of a duty which unreasonably endangered [his]

own physical safety," though the duty "must be specific to the plaintiff," not a general societal one. *Id.* (citations omitted). Plaintiff has not alleged the existence of any specific duty owed to him in particular.

Accordingly, plaintiff has failed to state a claim for intentional or negligent infliction of emotional distress claim, and those claims are dismissed.

### G. Malicious Abuse of Process

Plaintiff's fourteenth cause of action alleges malicious abuse of process under New York law. (Compl. at ¶¶ 295-99.) In addressing plaintiff's malicious abuse of process claim under section 1983, the court has already concluded that plaintiff has failed to plead the elements of malicious abuse of process under New York law because he has not alleged improper collateral objective. Therefore, plaintiff's New York law malicious abuse of process claim is dismissed.

Alternatively, the individual defendants are entitled to qualified immunity for the same reason that they are entitled to qualified immunity with respect to plaintiff's section 1983 malicious abuse of process claim.

### H. *Respondeat Superior* Liability

Plaintiff's seventh cause of action asserts that the City is responsible for the torts of the defendant officers under the doctrine of *respondeat superior*. (Compl. at ¶ 257.)

As the court has noted, "[a]lthough a municipality cannot be held vicariously liable on a section 1983 claim, under New York state law, a municipality may be held vicariously liable on state law claims asserted against individual officers under a theory of *respondeat superior*." *Marcano*, 38 F. Supp. 3d at 267 (citing *Linson v. City of New York*, 1003, 951 N.Y.S.2d 167, 168 (N.Y. App. Div. 2012) and *Eckardt v. City of White Plains*, 930 N.Y.S.2d 22, 25 (N.Y. App. Div. 2011)).

Here, because plaintiff has not stated a claim upon which relief can be granted with respect to any of his state law claims, there is no tort for which to hold the City responsible under the doctrine of *respondeat superior*. Plaintiff's *respondeat superior* claim, to the extent it constitutes a claim rather than an identification of a theory of liability, is therefore dismissed for failure to state a claim.

Additionally, it appears that municipalities may be entitled to assert qualified immunity and thereby avoid *respondeat superior* liability where the individual tortfeasor employee's actions are objectively reasonable. *See Hayes v. City of Amsterdam*, 770 N.Y.S.2d 138, 140 (N.Y. App. Div. 2003) (noting that municipal defendant must establish the "objective[] reasonable[ness]" of its employees' actions to successfully assert qualified immunity defense to *respondeat superior* liability). The court need not reach this issue, however, as

plaintiff has not stated any claim for which the City could be held liable under a *respondeat superior* theory even absent qualified immunity.

Further, even if plaintiff had stated a claim and the City could not avail itself of qualified immunity to avoid *respondeat superior* liability, where a complaint asserts both federal and state claims and the federal claims are dismissed before trial, the court may decline to exercise supplemental jurisdiction over the state claims. *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994); *accord* 28 U.S.C. § 1367(c). Here, even if plaintiff's state law claims were not dismissed, the court would decline to exercise supplemental jurisdiction over any properly pleaded pendent state law claims.

## Conclusion

For the reasons set forth herein, defendants' motion is granted in its entirety, and plaintiff's complaint is dismissed in its entirety. All of plaintiff's causes of action are dismissed for failure to state a claim upon which relief can be granted.

Furthermore, although leave to amend a complaint should be freely given, "[a] district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)

(citations omitted).  Here, the complaint before the court is plaintiff's fourth amended complaint – in other words, the fifth complaint he has filed in this action.  The court concludes that plaintiff has had ample opportunity to successfully plead his case, and has not done so.  Accordingly, plaintiff is denied leave to amend his complaint.  The Clerk of Court is respectfully directed to enter judgment in favor of defendants, to serve a copy of this order, the judgment, and an appeals packet on plaintiff, note service on the docket, and to close this case.

**SO ORDERED.**

Dated: Brooklyn, New York
       March 2, 2018

                              _____/s/_____
                              KIYO A. MATSUMOTO
                              United States District Judge
                              Eastern District of New York